IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

DONTE ROLANDO HARRIS,
    Defendant.

Criminal No.: ELH-02-0381

**MEMORANDUM OPINION**

Donte Rolando Harris filed a pro se "Motion for Modification of an Imposed Term of Imprisonment, Alternately, Motion for Sentence Reduction Pursuant to the First Step Act of 2018 – 18 U.S.C. 3582(c)(1)(A)." ECF 278. Thereafter, through counsel, Harris filed a "Motion for a Sentence Reduction Pursuant To 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 290 (collectively, the "Motion").  The Motion is supported by twelve exhibits.  ECF 290-1 to ECF 290-12.

Harris, who is now 46 years of age, has been incarcerated since August 2002. He is serving a sentence of 50 years for a series of armed robberies, imposed in January 2004 by Judge William Nickerson.[1] Harris seeks either immediate release or a reduction of his sentence to 25 years, due to "extraordinary and compelling reasons" that, in his view, warrant compassionate release.

---

[1] The case was originally assigned to Judge Benson E. Legg. The case was reassigned to Judge William Nickerson in 2003.  Because Judge Nickerson has retired, the case was reassigned to me.

Many of the proceedings in this case took place before the use of electronic filing. The first electronic filing was docketed on December 1, 2009, at ECF 196. However, I reviewed the Chambers files maintained by Judge Benson E. Legg and Judge William Nickerson. Moreover, in connection with earlier motions filed by the defendant, I ordered the official court file from the federal archives and reviewed it. *See* ECF 275.

The government opposes the Motion. ECF 297.  Defendant has replied. ECF 299.  He also filed three supplements. ECF 301; ECF 302; ECF 303.  And, on December 16, 2020, defendant's counsel informed the Court that defendant recently tested positive for COVID-19. ECF 303.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion, in part.  I shall reduce the total sentence to 30 years.

## I.     FACTUAL BACKGROUND[2]

On January 23, 2003, Harris and four codefendants were charged in a twenty-three count Second Superseding Indictment. *See* ECF 297-3.[3] In particular, Harris was charged with conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; bank robbery, in violation of 18 U.S.C. § 2113(a), (d) & (f); aiding and abetting, in violation of 18 U.S.C. § 2; and using, carrying, brandishing and possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

On March 24, 2003, Harris entered his first guilty plea. *See* ECF 297-4 (Presentence Report, "PSR") at 3. He pleaded guilty to conspiracy to commit bank robbery (Count One); bank robbery (Count Two); and brandishing a firearm in furtherance of a crime of violence (Count Three). *Id.* Notably, in the plea agreement, the parties agreed to a total sentence of 25 years'

---

[2] The procedural history and factual summary set forth in the Court's Memorandum Opinion of March 2, 2020 (ECF 275) are incorporated by reference and repeated as necessary to provide context and to resolve the pending Motion.

[3] Three of Harris's codefendants pled guilty and a fourth was convicted after trial. Juan Deante Dixon was sentenced to a total term of 216 months' incarceration after pleading guilty to one count of bank robbery, one count of aiding and abetting, and one count of using or carrying a firearm in relation to a crime of violence. ECF 81. Talina Bell received 12 months' incarceration for one count of aiding and abetting. *See* Docket.  And, Sherone Denise Barnes received probation for one count of robbery. *See* Docket.  Following a six-day trial, Billy Campbell Harding was convicted of conspiracy to commit bank robbery, five bank robberies or attempted bank robberies, and four counts of using or carrying a firearm in relation to a crime of violence. *See* Docket. He was sentenced to a total term of 96 years of incarceration. ECF 110.

imprisonment. *Id.* ¶ 4. However, on April 15, 2003, Harris sent a letter to the Court, expressing his desire to withdraw his guilty plea. ECF 75. A new lawyer was appointed for Harris and, following a hearing at which Harris was represented by his new lawyer, Judge Legg allowed him to withdraw his plea of guilty. ECF 112.

As a result, Harris proceeded to a jury trial, beginning on January 5, 2004, at which Judge Nickerson presided.  *See* Docket. During the first week of trial, the government presented more than 40 witnesses. Then, Harris again expressed interest in entering a plea of guilty. By that point, his Presentence Report (ECF 297-4) had already been prepared, in anticipation of sentencing in accordance with the first guilty plea.

According to that PSR, Harris had a combined adjusted offense level of 32, based on all of the bank robberies. *Id.* ¶ 115. The PSR did not include any deductions for acceptance of responsibility. *Id.* ¶ 116. Further, the PSR indicated that defendant qualified as a Career Offender under U.S.S.G. § 4B1.1, based on three prior convictions for crimes of violence. *Id.* ¶ 118. Notably, and as discussed, *infra*, the predicate offenses were two burglary convictions and one daytime housebreaking conviction. *Id.* ¶ 118. Moreover, the PSR reported that defendant agreed that he qualified as a Career Offender. *Id.* ¶ 5. As a result, the defendant had a final offense level of 34. *Id.*

The PSR recounted Harris's criminal history. According to the PSR, Harris was convicted on two occasions in 1992, when he was 17 years of age. *Id.* ¶¶ 122, 123. In particular, he was convicted of theft and daytime housebreaking, for which he was sentenced to one year incarceration and to fifteen months' imprisonment, respectively. *Id.* In 1994, the defendant was convicted of "Burglary-Intent to Steal-Night," for which he received an eight-year sentence, with all but 18 months suspended. *Id.* ¶ 124. In 1995, Harris was found guilty of nighttime burglary, for

which he was sentenced to eight years' imprisonment, with all but 18 months suspended. *Id.* ¶¶ 125. He violated his probation for the offenses referenced in ¶¶ 124 and 125 and, on November 1, 1995, he received concurrent sentences of five years' incarceration. *Id.* Then, in 1996, Harris was convicted of unauthorized use and malicious destruction. *Id.* ¶ 126. He received a total sentence of five and a half years of imprisonment, consecutive to the sentence imposed for the offense in ¶ 124. Harris was paroled in 2000. *Id.* ¶¶ 124, 125.

These criminal convictions resulted in a total of 14 criminal history points. *Id.* ¶ 127. Two points were added because the underlying bank robbery offenses were committed while defendant was on parole, and one point was added because the underlying offenses were committed less than two years after Harris was released from custody. *Id.* ¶¶ 128, 129. Thus, Harris had seventeen criminal history points, which equated to a Criminal History category of VI. *Id.* ¶ 130. Alternatively, as a result of his status as a Career Offender, Harris had a Criminal History Category of VI. *Id.* ¶ 131.

Harris entered a plea of guilty on January 12, 2004. According to the Judgment (ECF 122), Harris pled guilty to Counts Two, Three, Four, Five, Six, Eight, Ten, Twelve, Fourteen, Sixteen, Eighteen, Twenty, and Twenty-Two of the Second Superseding Indictment. Counts Three and Five charged using, carrying, and brandishing a firearm on January 11, 2002 and February 12, 2002, respectively, during and in relation to a crime of violence. The remaining counts charged bank robbery and aiding and abetting between January 11, 2002 and July 29, 2002. The parties stipulated to a total sentence of 50 years' imprisonment. ECF 297 at 2.

Harris proceeded directly to sentencing. At the time of sentencing, Harris was 29 years of age. *See* ECF 297-4 at 1. According to the PSR, Harris reported that he was in good health. *Id.* ¶ 153.

Judge Nickerson sentenced Harris to concurrent terms of 18 years for the robbery charges (Counts Two, Four, Six, Eight, Ten, Twelve Fourteen, Sixteen, Eighteen, Twenty, and Twenty Two). Count Three, by statute, required a mandatory, consecutive sentence of seven years' imprisonment, and Count Five required a mandatory, consecutive sentence of 25 years' incarceration. Thus, the Court sentenced Harris to a total term of 50 years of imprisonment. ECF 122. Despite the length of the sentence, Judge Nickerson indicated that the Plea Agreement was "very favorable" to Mr. Harris, in light of "the overwhelming evidence against him and the even longer sentence that would be imposed had he been convicted at trial." ECF 156 at 2 (citing Transcript of January 12, 2004 at 19).

Harris subsequently filed for post conviction relief under 28 U.S.C. § 2255. *See* ECF 134; ECF 140. In a Memorandum Opinion docketed March 8, 2006 (ECF 156), Judge Nickerson recounted the history of the case. He noted that Harris participated in eleven armed bank robberies between January and August 2002, some of which included the actual or planned abduction of bank employees. Judge Nickerson denied the petition for post conviction relief. *See* ECF 157 (Order of March 8, 2006).

Harris filed a second motion under § 2255 on November 22, 2006. ECF 172. It was denied on December 6, 2006. ECF 173; ECF 174. Then, on June 16, 2016, Harris filed a motion seeking relief under Rule 60(b) of the Federal Rules of Civil Procedure. ECF 239. Judge Nickerson regarded that motion as "a successive [§ 2255] petition." ECF 244 at 2. He dismissed the motion by Memorandum and Order of May 30, 2017. ECF 244; ECF 245.

In 2017, Harris also filed for habeas relief in the Southern District of Indiana. According to the government, relief was denied in that matter. *See* ECF 271 at 1 n.1 (citing Case No. 2:17-CV-00338-JMS-MJZ).

Harris again filed a motion for declaratory relief on August 2, 2019, challenging his conviction and sentence. ECF 261. By Memorandum and Order of March 2, 2020, I construed the motion as an unauthorized, successive § 2255 petition and denied it. ECF 275; ECF 276.

Harris, who was born in 1974, is now 46 years of age. He was recently transferred from USP Marion, a high security facility, to FCI Memphis, a medium security facility. ECF 301. Harris has served over 18 years of his 50-year sentence, which equates to about 36% of his sentence, exclusive of good time credits under 18 U.S.C. § 3624(b). ECF 290 at 1. His projected release date, according to the Bureau of Prisons ("BOP"), is June 11, 2048. *Id.* at 4. Defendant would be about 74 years of age at that time.

Harris's medical records reflect various health issues, including high blood pressure, prediabetes, and kidney disease. ECF 292 (Medical Records). Harris is also overweight with a BMI of 29. *Id.* at 2. Notably, Harris tested positive for COVID-19 on December 16, 2020. ECF 303.

The defendant filed a claim with the Warden seeking compassionate release in May 2020. ECF 290-1.  Defendant's claim was denied. ECF 290-2. Harris's appeal was also denied. *See* ECF 290-4.

## II.   STANDARD OF REVIEW

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, __ F.3d __, 2020 WL 7050097, at *2 (4th Cir. Dec. 2, 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *United*

*States v. McCoy*, __ F.3d __, 2020 WL 7050097, at *3 (4th Cir. Dec. 2, 2020).

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 2020 WL 7050097, at *3. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy,* 2020 WL 7050097, at *3. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy,* 2020 WL 7050097, at *3. But, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are more expansive than § 1B1.13. They indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D).

Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>  (I)  suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

9

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 2020 WL 7050097, at *3.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  And, in resolving a compassionate release motion, a court must also consider the factors in 18 U.S.C. § 3553(a).  *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, ___ Fed. App'x ___, 2020 WL 6743609, at *2 (4th Cir. Nov. 17, 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229,

230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 2020 WL 7050097, at *3 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, __ F.3d __, 2020 WL 6817488, at *1–2 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, __ F.3d __, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 2020 WL 7050097, at *8.  Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *McCoy*, 2020 WL 7050097, at *9 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 827.  But, compassionate release is a "rare" remedy.  *United States v.*

*Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.   COVID-19[4]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[5]   The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.   Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam*

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

*Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  As of December 23, 2020, COVID-19 has infected more than 18.2 million Americans and caused over 322,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Dec. 23, 2020).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt.  Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

Unfortunately, there is currently no cure or proven treatment that is available.  But, a vaccine has just become available on a limited basis, primarily for health care workers and the elderly.  It is anticipated that it will take months before it is widely available.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. And, the CDC cautions that the "more

underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Id.*

On June 25, 2020 and July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE

CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020).  Social distancing is particularly difficult in the penal setting, however.  *Seth*, 2020 WL 2571168, at *2.  Prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19.  The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered

as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, however, the virus persists in penal institutions.[6]  As of December 28, 2020, the BOP had 124,126 federal inmates and 36,000 staff.  And, as of the same

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020),

date, the BOP reported that 6,537 inmates and 1,616 BOP staff currently tested positive for COVID-19; 29,566 inmates and 2,746 staff have recovered from the virus; and 172 inmates and two staff member have died from the virus. Moreover, the BOP has completed 93,308 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 28, 2020). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Memphis, to which the defendant was recently transferred, as of December 28, 2020, the BOP reported that 54 inmates and 16 staff have tested positive for COVID-19 and 274 inmates and 48 staff have recovered at the facility. One inmate has died from the virus. And, the facility has completed 903 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 28, 2020).

## IV.   DISCUSSION

Harris moves for compassionate release on two grounds. First, he asserts that his health conditions render him particularly vulnerable to COVID-19. ECF 290 at 9-11. In this regard, defendant suffers from multiple medical conditions identified by the CDC as risk factors, including kidney disease, hypertension, and prediabetes. *Id.* at 10; ECF 292 (Medical Records). He is also

---

https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?name=styln-coronavisur&region=TOP_BANNER&block=storyline_menu_ recirc&action=click&pgtype=LegacyCollection&impression_id=78b44851-1885-11eb-baa7-3f68d7b814c8&variant=1_Show.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html?referringSource=articleShare.

somewhat overweight, with a BMI of 29. ECF 292 at 2. Alternatively, Harris contends that the "enormous disparity" between the sentence he received in 2004 and the sentence he would receive today is an extraordinary and compelling reason for relief. ECF 290 at 12-13. Moreover, Harris argues that the sentencing factors under 18 U.S.C. § 3553(a) counsel in favor of reducing his sentence to time served or, in the alternative, to a substantial reduction of sentence. *Id.* at 18-26.

The government opposes defendant's Motion at each step of the analysis. It argues that Harris's medical conditions do not render him eligible for release. ECF 297 at 8-13. And, in any event, the government maintains that Harris remains a danger to the community and the § 3553(a) factors militate against reducing his sentence. *Id.* at 14-18.

### A. Extraordinary and Compelling Reasons

Harris has been diagnosed with kidney disease. He also has hypertension and prediabetes, and he is overweight. And, according to his attorney, the defendant recently tested positive for COVID-19. ECF 303. The Court is unaware of defendant's condition in regard to the severity of the virus. But, his medical conditions, standing alone, and certainly when combined are the type that have been linked to an increased risk of a more severe illness from COVID-19. *See People of Any Age with Underlying Medical Conditions*, Ctrs. For Disease Control & Prevention (Nov. 2, 2020), https://bit.ly/38S4NfY.

To be sure, the coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). But, numerous courts have found that, in light of the COVID-19 pandemic, a serious chronic medical condition, such as hypertension or kidney disease, qualifies as a compelling reason for compassionate release. *See, e.g., United States v. Council*, No. 4:18-CR-00219, 2020 WL 5215142, at *2 (M.D. Pa. Sept. 1, 2020) (granting compassionate release to defendant with

hypertension and stage two chronic kidney disease); *United States v. White*, No. CCB-09-0369, 2020 WL 3960830, at *3 (D. Md. July 10, 2020) (obesity and stage two chronic kidney disease qualifies as extraordinary and compelling reason); *United States v. Salvagno,* No. 5:02-cr-00051-LEK, 2020 WL 3410601 (N.D.N.Y June 22, 2020) (granting compassionate release to inmate whose sole medical condition is hypertension); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection).

As indicated, defendant tested positive for COVID-19 in December 2020. ECF 303. Even if he recovers from the virus, it remains uncertain whether he can contract the illness again or whether he will experience ongoing complications from the virus, due to his underlying health conditions or because much is unknown about the long-term effects of the virus.

Several judges in this District have granted compassionate release to individuals who have contracted, and recovered from, COVID-19, if they also suffered from other underlying medical conditions. *See, e.g.*, *United States v. Braxton*, Crim No. JKB-09-478, 2020 WL 4748536 (D. Md. Aug. 17, 2020) (defendant suffers from multiple medical conditions); *United States v. Fletcher*, Crim. No. TDC-05-0179-01, 2020 WL 3972142 (D. Md. July 13, 2020) (defendant has Type 2 diabetes, chronic kidney disease, and hypertension); *United States v. Heyward*, Crim. No. PWG-

17-527, 2020 WL 3547018 (D. Md. June 30, 2020) (defendant was 65 years old and suffers from a "myriad [of] health conditions," in addition to COVID-19, including hypertension, chronic viral hepatitis C, peripheral vascular disease); *United States v. Williams*, Crim. No. PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (defendant is obese). Accordingly, I am satisfied that Harris satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

Based on this finding, I need not consider whether the disparity, if any, between the sentence Harris received in 2004 and the one he would likely receive today constitutes, on its own, an "extraordinary and compelling reason" for compassionate release. But, as discussed below, the Court may consider changes in the sentencing landscape with respect to its analysis under 18 U.S.C. § 3553(a).

## B.  SECTIONS 3142(g) AND 3553(a)

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent  Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government urges the Court to find that the defendant is still a danger to the community, citing the seriousness of this offense and his criminal history. ECF 297 at 19-20. According to the government, defendant is "a very dangerous man, with a history of non-compliant and anti-social behavior." *Id.* at 20. Further, the government contends that the factors under § 3553(a) militate in favor of denial of defendant's Motion. *Id.* at 18-21.

Defendant acknowledges the seriousness of his underlying crime spree. ECF 290 at 25. But, he contends that a reduced sentence would reflect that his offenses were committed when he "was [a] young man struggling to overcome an extended history of severe trauma and neglect." *Id.* at 19. And, he maintains that a reduction is warranted because of the "seismic changes in the sentencing landscape" since 2004. ECF 299 at 7. In particular, Harris was sentenced when the Guidelines were mandatory and when Harris's two firearm convictions under § 924(c) mandated a minimum term of imprisonment of 32 years. Further, defendant maintains that he should not serve "a sentence 25 years longer than what the government deemed an appropriate punishment prior to four days of trial." ECF 290 at 25.

As part of the § 3553(a) analysis, many judges in this District have considered a change in the penalties that a defendant would face if prosecuted today. *See, e.g., United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 2020 WL 7050097; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020). As Judge Bennett recently explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the

Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, No. RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020); s*ee also McCoy*, 2020 WL 7050097, at *11.

As to Counts Three and Five, the two firearm brandishing offenses under 18 U.S.C. § 924(c), Harris was sentenced to a total mandatory, consecutive term of 32 years of imprisonment. At the time, a defendant could be sentenced for multiple § 924(c) charges at the same time, even if the convictions were not yet final, resulting in a seven-year consecutive sentence for the first brandishing offense, and a mandatory minimum penalty of 25 years of imprisonment, consecutive, for each subsequent § 924(c) offense.  *See United States v. Jordan*, 952 F.3d 160, 165 (4th Cir. 2020).  Therefore, as to Harris's two convictions under 18 U.S.C. § 924(c), Judge Nickerson was statutorily required to impose seven and 25 year sentences, respectively, consecutive to the 18-year sentence he imposed for the bank robberies, for a total sentence of 50 years.

Section 403(a) of the First Step Act of 2018 ("FSA") amended the language of 18 U.S.C. § 924(c)(1)(C) by striking a "second or subsequent conviction under this subsection" and inserting "violation of this subsection that occurs after a prior conviction under this subsection has become final."  Therefore, the amendment has effectively eliminated the procedure of "stacking" multiple § 924(c) convictions for the purpose of enhancing the penalties associated with "second or subsequent" § 924(c) convictions within the same indictment.  *Id.*  Thus, the FSA amended § 924(c), so that it "no longer applies to multiple § 924(c) convictions obtained in a single prosecution."  *Jordan*, 952 F.3d at 171. However, this provision is not retroactive. *See* FSA, Section 403(a), (b); *see also Jordan*, 952 F.3d at 172.

Notably, the "fact that Congress chose not to make § 403 of the First Step Act categorically retroactive does not mean that courts may not consider that legislative change in conducting their individualized reviews of motions for compassionate release." *McCoy*, 2020 WL 7050097, at *11; *see also United States v. Haynes*, 456 F. Supp. 3d 496, 514-16 (E.D.N.Y. 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020).  In 2004, Judge Nickerson had to impose a total of 32 years' imprisonment for the two § 924(c) brandishing offenses. Today, the Court would be required to impose consecutive terms of seven years each.

The gravity of Harris's crimes cannot be minimized. Harris committed eleven armed bank robberies between January 2002 and August 2002, involving numerous victims, and he stole over $169,000. The lives of the individual victims were surely impacted by the defendant's heinous conduct. The weight of the evidence against Harris was also strong. As noted, during sentencing, Judge Nickerson indicated that the plea agreement was "very favorable" to Mr. Harris, in light of "the overwhelming evidence against him and the even longer sentence that would be imposed had he been convicted at trial." ECF 156 at 2 (citing Transcript of January 12, 2004 at 19).

Yet, on the very same facts that led to the 50-year sentence, the government had previously offered Harris a plea agreement calling for a total of 25 years' incarceration. *See* ECF 297-4, ¶ 4. The defendant accepted the plea. Then, for reasons not fully known to this Court, the defendant changed his mind. Judge Legg allowed the defendant to withdraw his guilty plea and he proceeded to a jury trial. After four days of trial, the defendant again wanted to plead guilty. However, at that point the government offered a 50-year plea deal—a dramatic increase from its earlier plea offer of 25 years on the same facts.

To be sure, with the original plea agreement, the government undoubtedly considered that, by pleading guilty, Harris spared the government, the Court, and the victims of the ordeal and

challenges of the trial process. The victims did not have to recount what they experienced. The government understandably rewards defendants for their acceptance of responsibility and their willingness to avoid the burdens of a trial. Defendant then reneged on his plea agreement and put the government, the Court, jurors, and witnesses through most of a trial. On these facts, it was entirely reasonable for the government to decide that the 25-year deal was no longer an option. The government's unwillingness to renew the original plea offer was not punishment of the defendant for his desire to exercise his right to go to trial.  That said, the second plea offer, which doubled the original plea offer, would seem to constitute punishment of the defendant for his decision.

Further, defendant argues: "As a result of the collective changes in applicable law, Mr. Harris's 50-year sentence is so out of step with current sentencing practices that it more than doubles the average sentence federal courts impose for murder." ECF 290 at 23. Indeed, Harris's sentence of 50 years is significantly longer than at least some federal sentences imposed more recently for multiple robbery offenses. Statistics compiled by the United States Sentencing Commission, for example, show that for fiscal year 2019, the average national sentence imposed for the crime of robbery was 109 months (9 years, 1 month); for murder, 255 months (21 years, 4 months); and for kidnapping, 171 months (14 years, 3 months). Table 15, "Sentence Imposed by Type of Crime," https://www.ussc.gov/2019-Annual-Report-and-Sourcebook ("2019 Sourcebook"); *see also United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)). This case involved multiple robberies. Harris received a sentence of 600 months'

incarceration, *i.e.*, 50 years. That sentence seems out of line with other sentences for serious offenses.

As reviewed earlier, Harris had garnered an extensive criminal history over a short time frame. *See* ECF 297-4, ¶¶ 122-126. However, all of Harris's previous convictions occurred between 1992 and 1995, when the defendant was between the ages of 17 and 20. *See McCoy*, 2020 WL 7050097, at *11  (noting that courts often consider a defendant's relative youth at the time of their offense as relevant in analyzing compassionate release motions). And, none of the prior offenses involved violence. ECF 297-4, ¶¶ 122-26.

Curiously, the parties do not address Harris's Career Offender status. But, it seems clear to me that Harris would not qualify today as a Career Offender. This is a matter that I may consider.

After Harris was sentenced in this case, the Supreme Court decided *United States v. Booker*, 543 U.S. 221 (2005), in which the Guidelines were deemed advisory. And, "the career offender provision is an advisory guideline promulgated by the United States Sentencing Commission.[]"  *United States v. Furlow*, 928 F.3d 311, 314 (4th Cir. 2019).   In turn, the Sentencing Commission is an agency within the judiciary that "Congress has tasked with promulgating 'guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case.'" *Id.* at n.1 (quoting 28 U.S.C. § 994(a)(1)).

Unlike the mandatory sentencing provisions applicable to an Armed Career Criminal, 18 U.S.C. § 924(e), "the career offender provision creates no statutory penalty." *Furlow*, 928 F.3d at 314.  However, a defendant who qualifies for an enhancement as a career offender "may be subject to an increased guidelines offense level and criminal history category, which would result in an increased Guidelines range." *Id.*  (citing U.S.S.G. § 4B1.1(b)).

Although the Guidelines are now merely advisory, not mandatory, *see*, *e.g.*, *Booker*, 543 U.S. at 260-62; *Rita v. United States*, 551 U.S. 338, 361-62 (2007), it is clear that the sentencing Guidelines are the "foundation of federal sentencing decisions." *United States v. Hughes*, ___ U.S. ___, 138 S. Ct. 1765, 1775 (2018). Indeed, the Guidelines range generally serves as the "starting point" in the effort of a judge to fashion a reasonable sentence. *Freeman v. United States*, 564 U.S. 522, 529 (2011). Thus, the Supreme Court has described the sentencing Guidelines as "the lodestone of sentencing." *Peugh v. United States*, 569 U.S. 530, 544 (2013).

Because of the "central role in sentencing" that attaches to the sentencing guidelines, an "error related to the guidelines can be particularly serious." *Molina- Martinez v. United States*, ___ U.S. ___, 136 S. Ct. 1338, 1345 (2016); *see United States v. Feldman*, 793 Fed. App'x 170, 173-74 (4th Cir. 2019*); United States v. Winbush*, 922 F.3d 227, 231 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 469 (4th Cir. 2017). Nevertheless, "a mistaken career offender designation is not cognizable on collateral review." *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015) (citing *United States v. Foote*, 784 F.3d 931, 932-33 (4th Cir. 2015)), *cert. denied*, 135 S. Ct. 2850 (2015)). And, in *Beckles v. United States*, ___ U.S. ___, 137 S. Ct. 886 (2017), the Court determined that the advisory sentencing Guidelines are not subject to challenges under *Johnson v. United States*, 574 U.S. 891 (2015). As the *Beckles* Court stated, "the advisory Guidelines do not fix the permissible range of sentences. To the contrary, they merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." *Id.* at 892.

But, significantly, this is not a post-conviction case. And, in my view, an error in the designation of Career Offender status would be relevant under § 3553(a). *See, e.g., United States v. Royster*, ___ F. Supp. 3d ___, 2020 WL 7392801, at *3-4 (M.D.N.C. Dec. 10, 2020) (considering

that defendant would no longer qualify as career offender under §4B1.1 in § 3553(a) evaluation); *United States v. Hickman*, CCB-07-261, 2020 WL 6393391, *4 (D. Md. Nov. 2, 2020) (same); *United States v. Lee*, DKC-12-0493, 2020 WL 4053352, *4 (D. Md. Jul. 20, 2020) (considering the "changed landscape when considering the goals of sentencing").

As I see it, Harris was erroneously deemed a Career Offender. A person qualifies as a Career Offender if the instant offense of conviction is a "controlled substance offense" or a "crime of violence," as defined in U.S.S.G. § 4B1.2(a) and (b), and the offense was committed after the age of 18. The defendant must also have two prior qualifying felony convictions, for either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a); *see also* § 4B1.2(c).

Under U.S.S.G. § 4B1.2(a), the term "crime of violence" means:

[A]ny offense under federal or State law, punishable by imprisonment for a term exceeding one year, that –

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

Harris was deemed to be a Career Offender, pursuant to U.S.S.G. § 4B1.1, based on two convictions for burglary and one conviction for daytime housebreaking. ECF 297-4, ¶ 131. These offenses are not proper predicates. Notably, in 2016, the Sentencing Commission amended the Guidelines by deleting "burglary of a dwelling" from the list of enumerated offenses. *See* U.S.S.G. § 4B1.2(a), Amendment 798. Today, the predicate convictions would not be considered crimes of violence under U.S.S.G. § 4B1.2(a). *See United States v. Al-Muwwakkil*, __ F.3d __, 2020 WL 7635764, at *9-11 (4th Cir. Dec. 23, 2020) (finding defendant's burglary conviction does not qualify as a violent felony under the Armed Career Criminal Act); *see also United States v.*

*Runyon*, __ F.3d __, 2020 WL 7635761 (4th Cir. Dec. 23, 2020) (analyzing crimes of violence under 18 U.S.C. § 924(c)(3)).

Harris's conduct for the past 18 years, while in BOP custody, is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'"  *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020).

Harris recognizes that he has not been a "model prisoner." ECF 290-9 (Letter from Harris to the Court). But, Harris reports that he has not incurred any disciplinary infractions in the last two years, and his record over the past 18 years is devoid of "any allegations of violence or fighting." ECF 290 at 20. In addition, Harris has recently completed a "Criminal Thinking" course and an anger management course. *Id.* at 20-21; ECF 290-10 (Course Certificates). And, he works in the prison barbershop. ECF 290 at 20-21. This reflects that Harris is in the process of maturing.

To Harris's credit, in a recent letter to the Court, he appears to have accepted responsibility for his criminal conduct. *See* ECF 290-9. Harris stated, in part: "Those mistake [sic] I myself made all those years ago, lord knows I honestly regret them and I apologize to all the people I hurt, especially the victims." *Id.* Harris's siblings, Elizabeth Womack and Leo Womack, also wrote letters to the Court, confirming that Harris has expressed deep remorse for his conduct. *See* ECF 290-11; ECF 290-12. His siblings also explained that they will be ready to support Harris when he is released. *Id.*; *see also* ECF 290 at 21.

Defendant also describes the way in which his history of severe trauma and neglect influenced his criminal conduct. ECF 290 at 19-21. According to Harris's aunt, Ivie Dawkins,

Harris's parents were struggling with addiction during Harris's childhood and, as a result, were unable to care for him. ECF 283 (Letter from Dawkins to the Court). Harris's parents apparently taught Harris to steal food so that he and his younger brother would not go hungry. *Id.* at 1-2. In addition, Dawkins notes that Harris's father was abusive and would "beat" him. *Id.* at 2.

Given the circumstances of this case, including the serious nature of Harris's numerous offenses, the strength of the evidence against him, and his prior record, I conclude that Harris has not met the requirements for immediate compassionate release. However, considering Harris's health and personal history, the disparity between the sentence imposed before and after trial, and the critical changes in the sentencing landscape that have occurred since 2004, I readily conclude that the 50-year sentenced is far "greater than necessary" to comply with the purposes of incarceration. 18 U.S.C. § 3553(a).

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *Braxton*, 2020 WL 4748536, at *5. Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment," upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have found that a court "need not choose between immediate, unconditional release or no relief at all" and have accordingly granted sentence reductions that did not result in immediate release. *See, e.g., United States v. Johnson*, No. RDB-07-0153, ECF No. 183 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168

months); *United States v. Marks*, Crim No. 03-6033L, 2020 WL 1908911, at *17 (W.D.N.Y. Apr. 20, 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, __ F. Supp. 3d __, 2020 WL 4251803, at *12 (E.D. Va. July 23, 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence…").

## V.   CONCLUSION

This case involves circumstances in which the defendant withdrew from his original plea agreement calling for a sentence of 25 years. Thereafter, he received a sentence that is double in length. And, the sentencing landscape has changed significantly since that time. From the Court's experience in sentencing defendants who have committed multiple armed robberies, a sentence of 50 years is out of step. For the reasons set forth above, a total sentence of 30 years is "sufficient, but not greater than necessary" to comply with the purposes of incarceration. 18 U.S.C. § 3553(a). Therefore, the Court will exercise its discretionary authority to reduce Harris's sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A).

I shall grant the Motion (ECF 290), in part, pursuant to 18 U.S.C. § 3582(c)(1)(A). I shall reduce Harris's sentences for the armed bank robbery charges (Counts Two, Four, Six, Eight, Ten, Twelve, Fourteen, Sixteen, Eighteen, Twenty, and Twenty-Two) from 18 years to 16 years, concurrent. And, I shall reduce the sentence for Count Five from 25 years to seven years, consecutive. Harris's consecutive sentence of seven years for Count Three remains unchanged. This reduces Harris's sentence to a total of 30 years' incarceration, representing concurrent terms

of 16 years for the robbery charges and 14 years, consecutive, for the two § 924(c) counts.  And, I shall adopt all of the previously imposed terms and conditions of supervised release, as initially imposed.

An Order follows.


Date:   December 30, 2020                                    /S/
                                                                  Ellen L. Hollander
                                                                  United States District Judge